# In the United States Court of Federal Claims

<table>
<tr><td>

**WILLIAM OLAS BEE,**

              *Plaintiff,*

**v.**

**THE UNITED STATES,**

              *Defendant.*

</td><td>

No. 21-1970
Filed: August 23, 2024

</td></tr>
</table>

*Darryl H. Steensma*, *Kyle R. Jefcoat*, *Michael Clemente*, *Ryan T. Giannetti*, *Ashley K. Gebicke*, Latham & Watkins LLP, San Diego, California and Washington, D.C., and *Esther Leibfarth*, Rochelle Bobroff, Matthew Handley, National Veterans Legal Services Program, Washington, D.C., for Plaintiff.

*Russell J. Upton*, Trial Attorney, *Steven J. Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., and Mary C. Anderlonis, Lieutenant Colonel, United States Marine Corps, Office of the Judge Advocate General, Washington, D.C., for Defendant.

## OPINION AND ORDER

**HADJI,** *Judge.*

      Following selfless service to the Nation, which included four deployments to Afghanistan, Plaintiff voluntarily separated from the Marine Corps in April 2013 as part of the "Voluntary Separation Program" for which he was paid a bonus of $106,956.18 to separate. AR 9, 195. He now brings this action asking the Court to "correct" his records to reflect that he was medically retired, rather than voluntarily separated, and thus entitled to additional compensation under 10 U.S.C. § 1201. Before the Court are Plaintiff's Motion for Judgment on the Administrative Record (ECF 47), the Government's Cross-Motion for Judgment on the Administrative Record (ECF 54), and the Government's Motion to Dismiss pursuant to Rule 12(b)(1) (ECF 54). For the following reasons, the Government's Cross-Motion for Judgment on the Administrative Record is **GRANTED**, and Plaintiff's Motion for Judgment on the Administrative Record and the Government's Motion to Dismiss are **DENIED**.

## BACKGROUND

Plaintiff served in the Marine Corps from 1999 to 2013. AR 50-51, 224. His primary military occupation specialty (PMOS) was initially that of infantry riflemen (0311). AR 60, 1039. Over the course of his service, he deployed to Afghanistan four times. AR 194, 311. During his third deployment, Plaintiff suffered a significant head injury in combat, exhibiting "[p]otential [Traumatic Brain Injury (TBI)] with persistent symptoms." AR 79. During his fourth deployment, he suffered extreme stress and trauma from witnessing the deaths of fellow Marines and was knocked unconscious from the detonation of multiple improvised explosive devices. AR 9, 15, 35-36. Due to the severity of his wounds, Plaintiff was medically evacuated from Afghanistan to Germany. AR 1, 9, 36. Following his return from his final deployment in June 2010, Plaintiff was diagnosed with TBI and Post-Traumatic Stress Disorder (PTSD). AR 173-78. He was placed on limited duty status until no later than December 2010,[1] although he continued to serve as an infantry squad leader and mortar section leader during that time. AR 1302-06, 1307-1311.

In October 2010, Plaintiff was promoted to staff sergeant (E-6) and his PMOS changed from rifleman (0311) to infantry unit leader (0369). AR 60, 383. He served for a short time as his battalion's substance abuse coordinator until mid-November 2010, when he transferred to the Marine Corps Field Medical Training Battalion-East. AR 383, 1314. There, he served as a Military Instructor for thousands of Navy medical and religious personnel slated to serve with Marine Corps units worldwide. AR 1314, 1316, 1321-1326. During his assignment at the Field Medical Training Battalion, he received fitness reports documenting his "outstanding" professional and military performance and ranking him in the upper half of the Marines in his reporting group. AR 2, 385-401.

More specifically, his 2011 fitness report listed various billet accomplishments and documented that Plaintiff: (1) developed field exercises to better train Navy personnel that more accurately represented tactics techniques and procedures used in operational theatres; (2) trained 1347 students in offensive/defensive attacks, ambushes, and land navigation field exercises and hikes; (3) completed the Formal School Instructor Course; (4) personally lead, mentored, and trained 314 sailors for duty in the Marine Operating Forces; (5) led platoons on 20 conditioning hikes totaling 100 miles; and (6) maintained flawless accountability of personnel, weapons, and equipment for his platoons. AR 1316; *see also* AR 511. Plaintiff's company commander not only recognized him as a "top performer" whose combat and infantry experience served as "the backbone for the highly successful training program provided to the Hospital Corpsmen as we prepare them for combat duty with the Marine Corps" but "enthusiastically recommend[ed him] for promotion and increased responsibility." AR 1320. Plaintiff's reviewing officer ranked him above 11 of his peers, stating that his "leadership skills, instructional ability, and attention to detail are

---

[1] The Government argues that Plaintiff's limited duty status terminated in October 2010. ECF 54 at 55. Plaintiff argues that it terminated in December 2010. ECF 47 at 42.

truly impressive" and noting that he "continues to excel in all aspects of job performance." AR 1320, 511.

Similarly, Plaintiff's 2012 fitness report noted that, among other things, Plaintiff: (1) personally led, mentored, and trained over 268 students in combat leadership, offensive and defensive operations, land navigation, weapons handling, close order drill, and physical training; (2) trained and mentored over 1,200 students in his role as the combat marksmanship coach; and (3) assisted in the development and refinement of a field exercise that reflected "more realistic and current tactics, techniques, and procedures used in the Fleet Marine Force." AR 1321. His leadership commended him as "an outstanding Marine" who performed in a "highly exemplary manner" and "[s]tands ready today to be a [Gunnery Sergeant]." AR 1325.

In October 2012, Plaintiff requested to separate early from the Marine Corps through the Voluntary Separation Program, four days after the program was announced. AR 9, 480. In January 2013, as part of the separation process, Plaintiff underwent a Department of Veterans Affairs (VA) Compensation and Pension exam (C&P exam) by Dr. Roy Vogel, who confirmed Plaintiff's diagnoses for TBI and PTSD and further diagnosed him with Post-Concussion Syndrome/Cognitive Impairment, Primary Insomnia, Generalized Anxiety Disorder, Panic Disorder with Agoraphobia, and Major Depressive Disorder. AR 8, 56-65. He assigned Plaintiff a nominal score indicating "[s]ome impairment in reality testing or communication; or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." AR 106.

Continuing the separation process, Plaintiff underwent a separation physical in February 2013. AR 188. During that exam, Plaintiff reported having an "excellent general overall feeling." AR 8, 99. He reported "[n]o decreased functioning ability" and "[n]o sensory disturbances," *id.*, and he was observed as having a "normal" affect. AR 100. He was "released w/o limitations," AR 103, and separated with a RE-1A code, indicating that he was qualified for service, separation, or to reenlist. AR 193, 481. He was honorably discharged from service on April 1, 2013, and received $106,956.18 in separation pay pursuant to the Voluntary Separation Program. AR 9, 195.

In October 2013, the VA issued a Rating Decision based on a review of records from the January C&P exam. AR 104. The decision found that Plaintiff's TBI and PTSD were "service connected" and rated each condition at 70%. AR 104-15. Plaintiff was also rated for other conditions and received an overall disability rating of 100%. AR 115. Several years later, Plaintiff also underwent an exam by a private physician, Dr. Michael Blumenfield, who opined that Plaintiff was not fit for service at the time of his discharge. AR 163-66.

In April 2018, Plaintiff applied to the Board for Correction of Naval Records (the Board) requesting that his naval records be corrected to reflect that his April 1, 2013, discharge was the result of a medical retirement rather than a voluntary separation. AR 29. The Board obtained advisory opinions from the Senior Medical Advisor to the Secretary

of the Navy Council for Review Boards (CORB) and the Director of the CORB, who recommended that Plaintiff be denied relief. AR 5-8. These opinions were provided to Plaintiff in advance of the Board's decision, and Plaintiff submitted briefing to the Board in July 2019. AR 567-584.

The Board denied Plaintiff's claim in August 2019. AR 1-3. In October 2021, Plaintiff filed his original complaint in this case alleging that the Board's decision was arbitrary, capricious, or otherwise contrary to law. ECF 1. The parties filed cross motions for judgment on the administrative record (ECF 20, 23), and the Government moved to dismiss the complaint (ECF 23). Following oral argument, the parties sought, and the Court granted, a remand to the Board. *See* ECF 36. The Board obtained another advisory opinion from its Physician Advisor, AR 509-519, and Plaintiff submitted a supplemental brief. AR 537-53.

On May 5, 2023, the Board issued a new decision, which again denied Plaintiff's request for corrective action. AR 470-488. On July 7, 2023, Plaintiff filed an amended complaint (ECF 42), and the parties filed new cross motions for judgment on the administrative record (ECF 47, 54). The Government also filed a Motion to Dismiss pursuant to Rule 12(b)(1) (ECF 54).

## DISCUSSION

This opinion is divided into two parts. Part I addresses the threshold jurisdictional statute of limitation argument raised in the Government's Motion to Dismiss. Part II addresses the merits of Plaintiff's case.

### I.    The Court has Jurisdiction over Plaintiff's Claims

The Court begins by addressing Defendant's Motion to Dismiss the Complaint as untimely under the pertinent six-year statute of limitations. Rule 12(b)(1) permits dismissal for lack of subject-matter jurisdiction.[2] This Court's jurisdiction is dependent on an unequivocal waiver of sovereign immunity by the United States. *United States v. Testan*, 424 U.S. 392, 399 (1976). The plaintiff bears the burden to demonstrate that jurisdiction is proper by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When considering a motion to dismiss under Rule 12(b)(1), "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If the Court determines that it lacks subject-matter jurisdiction, it must dismiss the action. Rule 12(h)(3); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Under the Tucker Act, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years

---

[2] Court of Federal Claims Rule 12(b)(1) is the same as Federal Rule of Civil Procedure 12(b)(1). *Compare* RCFC 12(b)(1) *with* Fed. R. Civ. P. 12(b)(1).

after such claim first accrues." 28 U.S.C. § 2501. Section 2501 "is jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity, may not be waived." *Hart v. United States*, 910 F.2d 815, 818-19 (Fed. Cir. 1990).[3] Nor may the Court consider whether certain equitable considerations warrant extending the limitations period under Section 2501. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008).

Where, as here, "a service member has not been considered or has been rejected for disability retirement prior to leaving active service, the service member can pursue disability retirement before a [Record Correction B]oard." *LaBonte v. United States*, 43 F.4th 1357, 1361 n.4 (Fed. Cir. 2022) (citing *Chambers v. United States*, 417 F.3d 1218, 1225 (Fed. Cir. 2005)). In such cases, the general rule is that the six-year statute of limitations runs from "[t]he decision by the first statutorily authorized board that hears or refuses to hear the claim[.]" *Chambers*, 417 F.3d at 1224. But there is an exception—the *Real* exception—which applies when "the veteran's knowledge of the existence and extent of his condition at the time of his discharge [is] sufficient to justify concluding that he waived the right to board review." *Chambers*, 417 F.3d at 1226 (quoting *Real v. United States*, 906 F.2d 1557, 1562 (Fed. Cir. 1990)). Stated differently, the *Real* exception applies when the service member knew at the time of his separation from the military, "that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected." *Chambers*, 417 F.3d at 1226. In such a case, the statute of limitations runs from the time of discharge. *See id.*

It is undisputed that Plaintiff had been diagnosed with TBI and PTSD and was aware of those diagnoses immediately before discharge. However, caselaw from this Court suggests that mere awareness of a disability is insufficient to invoke the *Real* exception. *See Johnson v. United States*, 123 Fed. Cl. 174, 179 (2015). Indeed, for a claim to accrue at discharge, *Real* itself suggests that a service-member must "underst[and] the full extent" of his disabilities. *See Real*, 906 F.2d at 1563 (declining to apply the *Real* exception where "no one knew exactly what was wrong with [Plaintiff] or understood the *full extent* of his mental problem at the time of his discharge" (emphasis added)). Here, Plaintiff likely did not understand the "full extent" of his TBI and PTSD before discharge because the degree of his disability—a 70% rating for PTSD and a 70% rating for TBI (100% total)—was not established until six months after his separation. In fact, his medical evaluations before discharge repeatedly rated him "fit for duty" with no limitations. AR 179-81. As such, it is reasonable to conclude that these positive evaluations, whether accurate or not, led Plaintiff

---

[3] In the last twenty years, the Supreme Court has repeatedly admonished courts for attaching jurisdictional labels to minor procedural requirements that can be characterized as "claim-processing rules." *See Kontrick v. Ryan*, 540 U.S. 443, 456 (2004). However, the Supreme Court has maintained that Section 2501 is "more absolute" in nature, suggesting that it remains a prerequisite for Tucker Act jurisdiction. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134-35 (2008). As such, this Court has continued to use Rule 12(b)(1) to resolve questions of timeliness under the Tucker Act. *See, e.g., Henderson v. United States*, 152 Fed. Cl. 460, 465 (2021).

to believe that his disabilities were of a less serious nature and that he was not "entitled to disability retirement."

Relatedly, the Court has also refused to apply the *Real* exception in cases where the service member was generally able to perform his duties at the time of discharge. For example, in *O'Hare v. United States*, the plaintiff was aware of his injury and diagnosis and had been placed on limited duty at the time of discharge. 155 Fed. Cl. 364, 373 (2021). Nevertheless, the Court declined to find that the veteran "*knew* he had a *permanent* disability that *entitled* him to disability retirement" because "he was able to perform his assigned duties, at least at certain times, and had reason to expect continued recovery." *Id.* The same is true here. Before his separation, Plaintiff was serving as an instructor for religious and medical personnel, and his fitness reports indicate that he performed adequately in this assignment. Given the general stability of Plaintiff's situation immediately before discharge, the Court is not convinced that he was aware "that he was entitled to disability retirement."

This is not to decide the ultimate merits question of Plaintiff's entitlement to disability retirement, which concerns Plaintiff's "unfitness to perform the duties of office, grade, rank or rating." Secretary of the Navy Instruction (SECNAVINST) 1850.4E, § 3301. As discussed below, the fact that a service member performs adequately within a particular billet does not necessarily mean that he is able to perform the broader duties of his office grade, rank, or rating. *See Kelly v. United States*, 157 Fed. Cl. 114, 125 (2021) ("[A] mere review of whether a member was adequately performing duties—regardless of what those were—immediately before separation is not sufficient."). For purposes of what Plaintiff knew or should have known, however, Plaintiff's adequate performance in his billet immediately before discharge weighs heavily against him knowing that he was entitled to medical retirement.

Having determined that the *Real* exception does not apply, the Tucker Act's six-year statute of limitations runs from "[t]he decision by the first statutorily authorized board that hears or refuses to hear the claim[.]" *Chambers*, 417 F.3d at 1224. Because the Board denied Plaintiff's claim on August 5, 2019—less than six years ago—Plaintiff's claim is timely.

## II. The Board's Decision Was Well-Reasoned, Consistent with Law, and Supported by Substantial Evidence

Turning to the merits, the Court reviews the Board's decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006). The Court does not reweigh the evidence, but rather considers whether the conclusion under review is supported by substantial evidence. *Riser v. United States*, 97 Fed. Cl. 679, 683-84 (2011). If the Board considered the relevant evidence and came to a reasonable conclusion, the Court will not disturb the Board's decision. *Id.* This lenient standard of review is violated, however, where the Board "entirely failed to consider an important aspect of the problem, offered an

6

explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

To qualify for disability retirement, a service member must (1) be determined "unfit to perform the duties of the member's office, grade, rank, or rating because of a physical disability" and (2) have at least 20 years of service *or* a disability rating greater than 30%. *Kelly v. United States*, 69 F.4th 887, 889 (Fed. Cir. 2023) (citing 10 U.S.C. § 1201). "A Service member shall be considered unfit when the evidence establishes that the member, due to physical disability, is unable to reasonably perform the duties of his or her office, grade, rank, or rating (hereafter called duties)[.]" Department of Defense Instruction (DoDI) 1332.38, E3.P3.2.1. In determining whether a service member can reasonably perform his or her duties, the following four factors should be considered: "(1) common military tasks, *i.e.*, whether the member is unable to reasonably perform routine assignments expected of his or her office, grade, rank or rating; (2) physical readiness/fitness tests, *i.e.*, whether the member's condition prohibits him or her from taking all or part of physical readiness/fitness tests; (3) deployability, *i.e.*, whether the member's condition prevents him or her from being positioned outside the [contiguous United States] for an unspecified amount of time; and (4) special qualifications, *i.e.*, whether the member's condition causes the loss of any specialized qualifications." *Ford v. United States*, 170 Fed. Cl. 458, 469 (2024) (citing SECNAVINST 1850.4E, § 3304).[4] The first factor, common military tasks, is dispositive on the ultimate question of the member's unfitness. By contrast, the remaining three factors cannot be used individually as the sole basis for a finding of unfitness. *See* SECNAVIST 1850.4E, § 3307.

The remainder of this section is organized into three parts. First, the Court briefly summarizes the Board's decision. Second, the Court addresses Plaintiff's argument that the Board committed clear legal error by failing to apply various laws and regulations. The Court pays particular attention to Plaintiff's argument that the Board withheld liberal consideration—a thinly veiled request for the Court to reweigh the evidence. Third, the Court addresses Plaintiff's argument that the Board either improperly relied on or discounted key pieces of evidence—an explicit request for the Court to reweigh the evidence.

A. Overview of the Board's Decision

The Board's comprehensive, 19-page decision correctly states that "the sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating because of

---

[4] The Board must apply the regulations that existed at the time of the member's discharge. *Chambers*, 417 F.3d at 1227 ("[T]he Army regulations in effect at the time of Chambers' discharge in 1970, rather than current regulations, guide our analysis."). At the time of Plaintiff's discharge, DoDI 1332.38, E3.P3.2.1. and SECNAVINST 1850.4E were controlling (SECNAVINST 1850.4E was replaced by SECNAVINST 1850.4F on June 17, 2019).

disease or injury incurred or aggravated while entitled to basic pay." AR 482, 488 (citing SECNAVINST 1850.4E, § 3301). Applying this standard, the Board found that although Plaintiff suffered from PTSD and TBI during service, "[t]he evidence simply does not support [the] contention that [Plaintiff was reasonably unable to perform the duties of [his] office, grade, rank, or rating as a result of those conditions." AR 488.

The Board's assessment of Plaintiff's fitness is supported by substantial evidence. Under the Administrative Procedure Act (APA), the Court reviews the Board's factual findings for substantial evidence. *OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1381–82 (Fed. Cir. 2019). "The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from the agency's decision.'" *Id.* (quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)).

Analyzing Plaintiff's numerous fitness reports from the years directly preceding his voluntary separation, the Board found that they "conclusively demonstrated" that Plaintiff was "capable of performing the duties of [his] office, grade, rank, or rating despite [his] medical conditions." AR 485. Significantly, the Board cited his 2011 and 2012 fitness reports, noting  that they "reflect that [he] successful[ly] trained thousands of Navy Medical Department and Religious Program personnel in the knowledge, skills, and abilities necessary to serve with and support the Marine Corps, which specifically included land navigation skills." AR 480. The Board recognized that Plaintiff's leadership lauded him for "maintaining 'flawless accountability of personnel, weapons, and equipment for [his] platoons,' for [his] 'leadership, professional knowledge, and meticulous attention to detail [which] earned [him] the respect and admiration of students and staff[],' and for developing 'field exercises that more accurately represent current tactics, techniques, and procedures currently being experienced in current operational theaters.'" *Id*. The Board also quoted Plaintiff's company commander's assessment of him from his 2012 fitness report:

> [A]n outstanding Marine who I have relied upon heavily to accomplish the mission of leading and training our Sailor and Marines at [the Field Medical Training Battalion]. His performance has had force-wide impact and significantly enhanced the quality, character, capabilities, and attitudes of thousands of Hospital Corpsmen, Religious Program Specialists, Chaplains, and Navy Medical Department Officers now serving with the Marine Corps operating forces worldwide. AR 485.

Capturing the crux of the case, the Board stated to Plaintiff: "The most compelling evidence that you were fully capable of performing the duties of your office, grade, rank, or rating was that you were, in fact, capably performing the duties of your office, grade, rank, or rating as an Instructor at [the Field Medical Training Battalion]." AR 483. The bulk of Plaintiff's arguments, addressed in detail below, essentially ask the Court to ignore the Board's conclusion that Plaintiff was successfully performing in his office, grade, rank,

and rating prior to his voluntary retirement and reweigh the evidence in Plaintiff's favor. As explained below, the Court declines to do so.

B. The Board Complied with Controlling Law

*1. 10 U.S.C. § 1552(h) & Liberal Consideration*

First, Plaintiff contends that the Board's "most obvious legal violation" was its failure to treat his application with "liberal consideration." ECF 47 at 29. The liberal consideration standard was first articulated in 2014 through a memorandum issued by Secretary of Defense Chuck Hagel. Acknowledging that "PTSD was not recognized as a diagnosis at the time of service" for Vietnam veterans, the Hagel Memo instructed correction boards to give liberal consideration to "petitions for changes in characterization of service" when the former service member's records indicated one or more symptoms of PTSD. Memorandum for Secretaries of the Military Departments from Secretary of Defense Charles Hagel (Sept. 3, 2014) (Hagel Memo) at 1, 3. Under the Hagel Memo, liberal consideration was limited to review of discharge characterizations—*i.e.*, "Honorable," "General (Under Honorable Conditions)," and "Under Other Than Honorable Conditions." *Doyon v. United States*, 58 F.4th 1235, 1238 (Fed. Cir. 2023).

Additional guidance was issued on August 25, 2017, by Under Secretary of Defense Anthony Kurta, for the purpose of expanding on the Hagel Memo and promoting "greater uniformity amongst the review boards." Memorandum for Secretaries of the Military Departments from Under Secretary of Defense for Personnel and Readiness (Performing the Duties of) Anthony Kurta (Aug. 25, 2017) (Kurta Memo) at 1. Unlike the Hagel Memo, the Kurta Memo did not limit its guidance to discharge characterization upgrades but extended to "any petition seeking discharge relief including requests to change the narrative reason, re-enlistment codes, and upgrades from General to Honorable characterizations." *Id.* at 3.

On December 12, 2017, Congress codified the liberal consideration standard into the Board's authorizing statute by amending 10 U.S.C. § 1552 to add sub-section (h). *See* National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91 § 520, 131 Stat. 1283, 1379 (2017). Section 1552(h) states in full:

> (1) This subsection applies to a former member of the armed forces whose claim under this section for review of a discharge or dismissal is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale, or as justification for priority consideration, and whose post-traumatic stress disorder or traumatic brain injury is related to combat or military sexual trauma, as determined by the Secretary concerned.
>
> (2) In the case of a claimant described in paragraph (1), a board established under subsection (a)(1) shall—

(A) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and

(B) review the claim with liberal consideration to the claimant that post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal.

10 U.S.C. § 1552(h).

The scope of liberal consideration under 10 U.S.C. § 1552(h) and the Kurta memo was recently addressed by the Federal Circuit in *Doyon v. United States*, 58 F.4th 1235 (Fed. Cir. 2023). There, the plaintiff, who had been discharged due to a personality disorder, requested that his records be corrected to reflect a medical discharge due to service-related PTSD. *Id.* at 1237. The Federal Circuit discerned two separate issues, the first being whether the plaintiff's military records should be changed to reflect a discharge due to PTSD instead of a personality disorder or, more specifically, whether the narrative reason for his discharge, as represented in his DD-214 form, should be corrected from the "BUPERSMAN Art. C-10310, 265" separation code (*i.e.*, unsuitability due to personality disorder) to the "BUPERSMAN C-10305" separation code (*i.e.*, separation due to physical disability). *Id.* at 1244. The second issue, which the Federal Circuit declined to address, involved a larger underlying dispute about whether the plaintiff was unfit, rather than unsuitable,[5] for service at the time of his discharge from the Navy and therefore entitled to disability retirement. *Id.* at 1248.

Regarding the first issue, the Federal Circuit held that the liberal consideration applied to the plaintiff's request to correct his DD-214 to reflect a discharge due to PTSD instead of a personality disorder. *Id.* at 1237. According to the Federal Circuit, liberal consideration under 10 U.S.C. § 1552(h) and the Kurta memo is not limited to misconduct-based discharge upgrades or modifications but also applies to requests seeking to correct the narrative reason for a service member's discharge. *Id.* at 1247-48. Because Plaintiff's request to change his DD-214 was "a challenge to the accuracy of the narrative reason listed on his DD-214 form," the Federal Circuit concluded that the Board was required to review the plaintiff's application with liberal consideration. *Id.* at 1244.

---

[5] Under controlling naval regulations at the time of plaintiff's discharge, service members could be "separated [from military service], by reason of *unsuitability*, with an honorable or general discharge" for, among other reasons, character and behavioral disorders "[a]s determined by medical authority." Military disability retirement, on the other hand, is governed by 10 U.S.C. § 1201, which provides: "[U]pon the Secretary's determination that a service member is 'unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay,' the service member may retire for disability." *Chambers*, 417 F.3d at 1223, 1224 (quoting 10 U.S.C. § 1201(a)).

The Federal Circuit's analysis ended there. *Id.* at 1248. Although the Federal Circuit acknowledged the second "underlying dispute about whether Mr. Doyon was unfit, rather than unsuitable, for service at the time of his discharge from the Navy," the Federal Circuit determined that "[t]his unfitness dispute between the parties is not properly before us at this stage and can be addressed, if necessary, on remand." *Id.* The Federal Circuit emphasized that the case was only "narrowly about correcting Mr. Doyon's military records to reflect a discharge due to PTSD instead of a personality disorder." *Id.*

The instant case arrives in a different posture and is purely limited to the second, underlying issue in *Doyon*—whether Plaintiff was unfit for service at the time of his discharge from the Navy. There is no partial relief requested in this case—that is, Plaintiff does not ask that his DD-214 read anything other than medical retirement and *unfitness* due to PTSD and TBI. Unlike in *Doyon*, Plaintiff does not quarrel with the accuracy of the narrative reason for his discharge (voluntary separation), nor does he ask that the Board correct this reason regardless of whether it grants his disability retirement claim. Ultimately, Plaintiff's request to correct his records, including his DD-214, is entirely coextensive with his disability retirement claim.

The question remains whether liberal consideration applies to fitness determinations. According to Plaintiff, a straightforward application of *Doyon* suggests that it does. *Doyon* held that liberal consideration under 10 U.S.C. § 1552(h) applies to requests seeking to correct the narrative reason for a service member's discharge. *Doyon*, 58 F.4th at 1248. And here, Plaintiff essentially seeks to change the "Narrative Reason for Separation" block on his DD-214 from "FORCE SHAPING-VSP" to "medical retirement." AR 193; Am. Compl. at 46. As Plaintiff's fitness is a factual determination necessary to correcting the narrative reason for discharge, liberal consideration would necessarily extend to that question as well. *See Doyon*, 58 F.4th at 1244 ("[A] veteran's challenge to the recorded narrative reason for discharge necessarily encompasses the factual determinations necessary to correct or maintain the narrative reason."). On the other hand, the Government insists that liberal consideration does not apply to fitness determinations, relying in part on a memo issued on April 4, 2024, by Ashish S. Vazirani, the Under Secretary of Defense, Personnel and Readiness (Acting) (Vazirani Memo). ECF 70-1 at 3-4.[6] The Vazirani Memo states that "the application of liberal consideration does not apply to fitness determinations" and that corrections boards "should not apply liberal consideration to retroactively assess the Applicant's medical fitness for continued service prior to discharge." *Id.* at 31.

Even accepting Plaintiff's argument that liberal consideration applies to fitness determinations, which the Federal Circuit declined to answer in *Doyon*, the Court is

---

[6] The Vazirani Memo was issued after the decision on review and, thus, was not binding on the Board. ECF 70-1 at 31; AR 3. Nor is it due any deference from the Court in interpreting Section 1552(h). *See Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) ("… courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous").

satisfied that the Board liberally considered the evidence submitted by Plaintiff in support of his unfitness. Although the Board did not use the phrase "liberal consideration" in its decision, the presence or absence of the phrase "liberal consideration" should not dictate whether liberal consideration was actually applied. Indeed, the Federal Circuit has regularly eschewed "magic words" requirements. *See, e.g., Pickett v. McDonough*, 64 F.4th 1342, 1347 (Fed. Cir. 2023) ("[T]here must be some indication that the proper analysis under the regulation occurred, but we hold that § 3.156(b) does not require the VA to invoke certain "magic words" in its decision). Here, the Board issued a comprehensive 19-page opinion that fully grappled with the evidence both for and against Plaintiff's claim. This is not a case, for example, where the Board failed to consider and weigh medical evidence submitted by the claimant, including opinions by civilian doctors post-dating a veteran's service. *See Labonte v. United States*, No. 18-1784C, 2023 WL 3197825, at *9 (Fed. Cl. May 2, 2023) (finding that the Board withheld liberal consideration where it "did not wrestle with or seek to explain why [certain] medical opinions should not be followed); *Hassay v. United States*, 150 Fed. Cl. 467, 484 (2020) (finding the Board withheld liberal consideration where it did not consider the VA's determination that the veteran's mental health condition was connected to military service).  Indeed, the Board fully wrestled with and explained its reasoning for discounting the medical evidence submitted by Plaintiff— particularly, the opinions of Dr. Blumenfield and Dr. Vogle. AR 478-81. The Board provided detailed analysis of each opinion but ultimately found that such evidence was less probative on the question of fitness than Plaintiff's fitness reports showing that Plaintiff was successfully performing his duties prior to discharge. *Id.* Nor is this a case where the Board failed to consider personal testimony submitted by the claimant. *See Hassay*, 150 Fed. Cl. at 484 (2020) (finding the Board withheld liberal consideration where it did not have in front of it the "transcript of [plaintiff's] testimony before the Board of Veterans Appeals … describ[ing] the assaults and harassment"). The Board duly considered affidavits submitted by Plaintiff and his wife but, again, did not find that such testimony reflected upon Plaintiff's ability to perform the duties of his office, grade, rank, or rating. AR 483. Although liberal consideration may in certain cases alleviate a claimant from the normal burden of proof, it does not prevent the Board from weighing the evidence or discounting evidence in support of Plaintiff's disability retirement claim if the Board in fact provides articulable and legitimate reasons for doing so.

Because the Board applied liberal consideration in all but name, to the extent that it was required to apply liberal consideration, the Court finds it did so. In fact, the Court strains to understand how the Board could more liberally consider Plaintiff's disability retirement claim short of simply abdicating its fact finder duties and taking all evidence of Plaintiff's unfitness as irrefutable without further examination or weighing of contrary evidence. More generally, liberal consideration is an invitation to robustly engage with the evidence specifically affecting the veteran, not run away from it. *See Doyon.* And the Court finds that the Board accepted that invitation here.

### 2. *DoDI 1332.38 & SECNAVINST 1850.4E*

Plaintiff further argues that the Board opened its decision by broadly disclaiming its intention to not follow DoDI 1332.38 and SECNAVINST 1850.4E. ECF 47 at 28-29. This assertion appears to be based on the Board's statement that "[n]either DoDI 1332.38 nor SECNAVINST 1850.4E applies to this Board; rather, they provide regulatory guidelines for the Board to use in assessing whether there exists an error or injustice in your naval record." ECF 47 at 28; AR 472. However, this language, while perhaps inartful, hardly evidences an intention to not follow controlling legal authority. The Court reads such language as simply making the modest and correct point that the regulations at issue were intended to be implemented by the Physical Evaluation Board (PEB) in the first instance.[7] Ultimately, there is little point in quibbling over the Board's wording because the Board in fact applied both DoDI 1332.38 and SECNAVINST 1850.4E throughout its opinion. Indeed, the Board quoted in full SECNAVINST 1850.4E, § 3301, stating "[t]he sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating." AR 473. The Board not only laid out this standard but repeated its operative language no less than 25 times. AR 473-488.

Plaintiff also contends that the Board overlooked the "deployability" factor set out in SECNAVINST 1850.4E, § 3304. ECF 47 at 32-35. As discussed above, that regulation states that determining whether a member can reasonably perform his or her duties includes consideration of four factors pertaining to (1) common military tasks; (2) physical readiness/fitness tests; (3) deployability; and (4) special qualifications. Of these four factors, Plaintiff argues that the Board expressly declined to address the issue of deployability and, instead, considered only Plaintiff's fitness to serve in a "garrison environment." ECF 47 at 33 (quoting AR 484).

Plaintiff is correct that the Board did not explicitly address the issue of deployability but this omission is not a point of error. Navy regulations were clear at the time of Plaintiff's discharge that the issue of deployability could not serve as the sole basis for involuntary discharge: A key regulation then in existence, SECNAVINST 1850.4E, § 2051, recognized that "non-deployability alone will not normally constitute a basis for a finding of Unfit." Similarly, SECNAVINST 1850.4E, § 3307a provides that "[i]nability to perform the duties of his or her office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of Unfitness." *See also* § 3304(3). The Board expressly cited this regulation in limiting its analysis to whether Plaintiff could serve in a non-deployment setting or "garrison

---

[7] Under the Navy's regulations, the PEB is the entity responsible for making "determinations of fitness to continue naval service, entitlement to benefits, disability ratings, and disposition of service members referred' to it from the Navy." SECNAVINST 1850.4E at 3. Although Plaintiff was never referred to the PEB for evaluation before being discharged, the standards established in DoDI 1332.38 and SECNAVINST 1850.4E apply to both the Board and this Court in evaluating Plaintiff's claim. *See Ford v. United States*, 170 Fed. Cl. 458, 469-70 (2024).

environment." AR 484-86. Because the Board found no other basis for finding Plaintiff unfit, it had no reason to consider the issue of deployability as it alone could not have affected the outcome of the Board's decision. AR 484-85.

As for the remaining three factors, the Court is satisfied that the Board considered and addressed them in its opinion. Plaintiff does not argue otherwise. Regarding the first factor, common military tasks, the Board detailed Plaintiff's duties in his instructor billet at the Field Medical Training Battalion and relating those tasks to the broader duties of an infantry unit leader. AR 484-84. As for the second factor, physical readiness/fitness tests, the Board found that Plaintiff "performed first-class physical and combat fitness tests" while serving as instructor at the Field Medical Training Billion. AR 484. Finally, the Court is satisfied that the Board considered the fourth factor, special qualifications, which concerns "[t]he inability to perform specialized duties or loss of special qualification, i.e., aviation, parachuting or diving qualifications, etc." SECNAVINST 1850.4E, § 3307c. Although the Board did not address such a factor by name, it noted that Plaintiff maintained "the capabilities of core and core plus skills for a 0300 Basic Infantry Marine," AR 484, which include training and qualification for standard service weapons. Infantry Training & Readiness Manual from Commandant of the Marine Corps (Aug. 30, 2013), NAVMC 3500.44B at 8-3 to 8-6 (T&R Manual). The Board also noted that Plaintiff "instructed and maintained marksmanship with the M9 service pistol and the M4 carbine." AR 484. For his part, Plaintiff does not contend that he ever lost or lacked a required special qualification. And any argument as to this factor is deemed waived as it was neither raised by Plaintiff before the Board (despite being ably represented) nor in his briefings to this Court post-remand. *Christian v. United States*, 46 Fed. Cl. 793, 802 (2000) ("issues and arguments not made before the relevant military correction board or administrative agency are deemed waived and [cannot] be raised in a judicial tribunal"). The Court is satisfied that the Board correctly considered and construed the controlling regulations and so turns to the Board's weighing of the evidence.

### B. The Board's Factual Findings are Supported by Substantial Evidence

Plaintiff's remaining arguments, detailed below, ask the Court to modify the weight assigned by the Board to each piece of evidence. Plaintiff argues that the Board assigned too much weight to his fitness reports and his separation physical while incorrectly discounting the reports of Drs. Vogel and Blumenfield. The Court addresses each piece of evidence in turn.

#### 1. Fitness Reports

First, Plaintiff argues that the Board improperly relied on fitness reports describing his positive performance in his instructor billet without giving any consideration to whether he was capable of performing the duties of his broader rating of infantry unit leader. ECF 47 at 35-36. According to Plaintiff, these fitness reports were prepared by non-Marines, evaluated his performance in a non-combat role, and did not reflect his fitness to perform the broader duties of an infantry unit leader. *Id.* Plaintiff cites *Kelly* for the proposition that

"a mere review of whether a member was adequately performing duties—regardless of what those were—immediately before separation is not sufficient." *Id.* at 36 (quoting 157 Fed. Cl. at 125).[8]

However, Plaintiff's reliance on *Kelly* is misplaced. There, the Board found that the plaintiff was fit to serve as a Second-Class Navy Diver at the E4 grade based on two performance evaluations conducted while he was serving in an administrative role. 157 Fed. Cl. at 126. The Board erred, the Court concluded, because it "made no explicit or implicit finding regarding what duties a Second-Class Navy Diver at the E4 grade is reasonably expected to perform or finding that the duties Plaintiff was performing during the periods covered by the two evaluation reports included such duties." *Id.* In other words, the Board failed to consider whether the duties that the plaintiff was performing immediately before separation overlapped with the duties expected of his grade, rank, and rating. *See id.*

Here, however, the Board did exactly that. Specifically, the Board determined that "the duties that [Plaintiff] performed in [the instructor] billet were substantially the same as [he] would have been performing as an Infantry Unit Leader assigned to an operational Marine combat unit in a garrison environment." AR 484. In fact, the Board found that "[t]he only appreciable difference between [Plaintiff's] duties as a FMTB-E Instructor and those [he] would have had if assigned to a operational Marine Corps unit in garrison … was in the responsibilities, qualifications, and uniforms worn by the Service members operating under [Plaintiff's] supervision at FMTB-E and the uniform worn by the officer to whom [he] reported." AR 484-85.

This finding is supported by substantial evidence. Although Plaintiff's instructor billet focused on teaching Navy medics and chaplains, he was not teaching medicine or theology. AR 1314. Rather, the purpose of Plaintiff's instructor billet was to train and prepare Navy personnel for serving in the field with operational Marine combat units. AR 1314, 1316, 1321, 1326. Essentially, Plaintiff was an infantry instructor for non-infantry personnel actively serving with supporting infantry Marines. *See id*; *see also* AR 1320 ("[Plaintiff's] combat and infantry experience are the backbone for the highly successful training program provided to the Hospital Corpsmen as we prepare them for combat duty with the Marine Corps."). As the Board recognized, Plaintiff "performed first-class physical and combat fitness tests; instructed and maintained marksmanship with the M9 service pistol and the M4 carbine; and instructed personnel on land navigation, offensive

---

[8] The parties disagree as to whether Plaintiff's instructor billet was coded for his rating of infantry unit leader (PMOS 0369). ECF 54 at 16 n.5. The Board found that it was after noting that three of the four fitness reports Plaintiff received while assigned as an instructor at FMTB-E listed 0369 as the billet PMOS while the outlier fitness report, which listed 3529 (Motor Transport Maintenance Chief) as the billet PMOS, reflected clear clerical error as the duties performed had no relation whatsoever to that PMOS. AR 484. This point of contention is ultimately of little consequence, however, because the primary question is whether Plaintiff's duties in his instructor billet were substantially similar to those of his broader rating, regardless of how that billet was coded.

and defensive attacks, and ambushes." AR 484; *see also* AR 1316. Plaintiff instructed his students in "combat leadership" and developed field exercises that more accurately reflected "current tactics, techniques and procedures used in the Fleet Marine Force." AR 1321. These combat-related activities are a far cry from the administrative duties that the Board improperly focused on in *Kelly*.

Further, the nature of Plaintiff's students hardly detracts from his capabilities as an instructor. Plaintiff seemingly suggests that he was assigned to teach chaplains and medics because he could not cut it teaching normal Marines. ECF 47 at 37. But this reasoning seems backwards in many ways. As the Board reasoned, anyone who can teach non-infantry, non-Marine personnel to become proficient in infantry tactics is just as if not more capable of doing the same for actual Marines. AR 485. Plaintiff makes much of the fact that he was training non-combatants at the Field Medical Training Battalion, arguing that "[t]here is simply no comparison between training infantry Marines, who are combatants, and training Navy Medical Department and Religious Program personnel, who expressly are not combatants." ECF 47 at 37. However, Plaintiff did in fact train combatants in his instructor billet—the Religious Program Specialists (RPs) serving with combat Marines are combatants. *See* SECNAVINST 1730.7E at 4 ("RPs are combatants and will bear arms in connection with their military duties."). Moreover, while Navy Combat Corpsmen serving with Marine Corps units are non-combatants, they are permitted under the Laws of War to be armed and to use deadly force in self-defense and in defense of their patients against unlawful attacks. *See* Department of Defense Law of War Manual, § 4.10.1. The very essence of Plaintiff's job was to prepare such personnel for combat should such circumstances arise. AR 1320 (explaining that Plaintiff's role in the "highly successful training program provided to the Hospital Corpsmen" was to "prepare them for combat duty with the Marine Corps.").

Plaintiff also contends that the Board's findings are erroneous because it never recited the requirements and duties of an infantry unit leader at the E6 grade. ECF 47 at 32-33. The Court disagrees. The Board noted that, per the Marine Corps Infantry Training and Readiness Manual, every billet coded for an infantry unit leader must "maintain the capabilities of core and core plus skills for a 0300 Basic Infantry Marine." AR 484. And the Board addressed the substance (if not the exact wording) of the Training and Readiness Manual throughout its opinion. For example, the Training and Readiness Manual provides that infantry Marines must be able to navigate with a map and compass and conduct land navigation. T&R Manual at 8-4, 9-11 to 9-21. In this regard, the Board found that Plaintiff successfully trained thousands of Navy medical and religious personnel in land navigation skills. AR 480. The Manual also provides that infantry unit leaders must be able to lead units in offensive and defensive operations. T&R Manual at 9-50 to 9-58, 9-98 to 9-103. And the Board found that Plaintiff instructed personnel on "offensive and defensive attacks[] and ambushes." AR 484.

If Plaintiff's argument is that the Board should have exhaustively catalogued the duties of an infantry unit leader at the E6 grade, the Court is aware of no such requirement.

Rather, the Board must "consider[] the relevant evidence and [come] to a reasonable conclusion." *Riser*, 97 Fed. Cl. at 683–84. Here, the Board did both. The Board certainly considered the relevant duties of an infantry unit leader at the E6 grade. In addition to the duties described in the Training and Readiness Manual, the Board considered the duties set forth in the Marine Corps MOS Manual, which the Board found to be "remarkably similar" to the duties of Plaintiff's instructor billet. AR 484. And for the reasons discussed above, the Board came to a reasonable conclusion in finding that the duties Plaintiff performed in his instructor billet were "substantially the same" as he would have been performing as an infantry unit leader in a garrison environment. AR 484.

Resisting this reasoning, Plaintiff argues that the Board reached this conclusion without considering any duties or common military tasks involving active engagement in combat. ECF 47 at 32-34. Plaintiff contends that "preparing for and engaging in operational, deployable *combat* duty are the core common military tasks that an Infantry Unit Leader 'could reasonably be expected to perform'". ECF 47 at 34. Plaintiff points out that the Marine Corps MOS manual requires that infantry unit leaders be able "supervise and coordinate… the fire and movement between tactical units, the fire of supporting arms, and the unit resupply and casualty evacuation effort." *Id.* at 32.

This argument, however, simply rehashes the issue of deployability. As discussed, controlling regulations at the time of Plaintiff's discharge recognized that "non-deployability alone will not normally constitute a basis for a finding of Unfit." SECNAVIST 1850.4E, § 2051. If not explicit in the text of § 2051, it is at least strongly implied that the ability to engage in combat, like the ability to deploy, cannot serve as the sole basis for a finding of unfit. Although Plaintiff argues that combat falls within the "common military tasks" of an infantry unit leader, the term "common military task" must be read in conjunction with § 2051. In other words, because deployability cannot serve as the sole basis for a finding of unfit, neither can a member's inability to perform "common military tasks" that are only prevalent in a deployment setting. And given the rarity of military engagements on American soil, combat is not a "common military task" for soldiers in a stateside environment. Indeed, it is difficult to conceive of a circumstance in which a soldier who is not deployed can reasonably expect to engage in combat with the enemy. In sum, the Board did not err by failing to consider military tasks related to direct engagement in combat.

Nonetheless, Plaintiff contends that § 2051 should not be read as applying to Marines with combat ratings but only certain non-combatants who can perform their normal duties without leaving the country. ECF 57 at 26. However, Plaintiff's selective application of § 2051 is wholly atextual and would essentially swallow the rule. In providing that "non-deployability alone will not normally constitute a basis for a finding of Unfit," nowhere does § 2051 caveat "unless that service member is a rifleman, pilot, or other member with a combat-related rating or who can expect to deploy." In the absence of any limiting language, the Court presumes that § 2051 was intended to apply to all Marine Corps and Navy personnel regardless of rating. Plaintiff may take issue with the

prudence of such a regulation, but it is not for this Court to second guess the rules promulgated by the Secretary. It is well settled that "the military is entitled to substantial deference in the governance of its affairs." *Dodson v. United States Gov't, Dep't of the Army,* 988 F.2d 1199, 1204 (Fed. Cir. 1993); *see also Orloff v. Willoughby,* 345 U.S. 83, 93  (1953) ("[J]udges are not given the task of running the Army.").

Even so, the facts of this case evince the very purpose and wisdom behind such a rule. Plaintiff provided enormous value to the Navy and Marine Corps by readying other personnel to deploy and serve in the field alongside combat units, regardless of whether he himself could deploy. In treating the issue of deployability as non-dispositive, the Secretary of the Navy recognized the value that countless service members, including Plaintiff, have added to the Navy and Marine Corps outside a deployment setting. Consider the following commendation Plaintiff received a year before his separation:

> [Staff Sergeant] Bee is an outstanding Marine who I have relied upon heavily to accomplish the mission of leading and training our Sailor and Marines at [the Field Medical Training Battalion]. His performance has had force-wide impact and significantly enhanced the quality, character, capabilities, and attitudes of thousands of Hospital Corpsmen, Religious Program Specialists, Chaplains, and Navy Medical Department Officers now serving with the Marine Corps operating forces world-wide.

AR 1325. In another fitness report, the reviewing officer stated that "[a]lthough [Plaintiff] is leaving active duty, if he ever returns and I was given the opportunity, I would actively seek him out to serve with anywhere at any time." AR 1330. To be sure, the weight of the evidence suggests that our military would not have been better served by involuntarily discharging Plaintiff.

### 2.  *Separation Physical*

Plaintiff next argues that the Board improperly relied on his separation physical, which as discussed, deemed him "qualified for service" and released him "w/o limitations." AR 103, 189. Plaintiff contends that the Board improperly assigned the presumption of regularity to this physical, which he argues, failed to comply with standard procedure. ECF 47 at 38-39. Binding guidance at the time required that separation physicals "include … a review of the individual medical history and medical record … [and] any indicated specialty consultations." *See* Policy Guidance for Separation Physical Examinations (Oct. 14, 2005), ECF 42-1 at 3. According to Plaintiff, although the separation physical ordered a general neurology consult referral "there is no record evidence of such a follow-[up] evaluation, and the examiner did not wait to give Plaintiff an opportunity to pursue such specialty consultation before signing off on the separation physical." ECF 47 at 39. Guidance also required that separation physicals include an assessment regarding a member's worldwide qualifications for retention (according to service guidelines) or need

for referral to a Medical Evaluation Board (MEB). ECF 42-1 at 3. Plaintiff contends that the separation physical inexplicably failed to make such an assessment. ECF 47 at 39.

Even if the separation exam was irregular, however, the Court applies the rule of harmless error. *See* 5 U.S.C. §706(a) ("due account shall be taken of the rule of prejudicial error"); *Wagner v. United States*, 365 F.3d 1358, 1361 (Fed. Cir. 2004) "[S]trict compliance with procedural requirements is not required where the error is deemed harmless."). Whether Plaintiff should have been referred to a MEB is not determinative of whether he would have ultimately been found unfit for duty. *See Qoye v. United States*, No. 20-1388C, 2024 WL 1435060, at *4 (Fed. Cl. April 3, 2024). The issue here is "not whether the Navy's treatment of Plaintiff's disability retirement request was procedurally perfect, but whether the [Board's] ultimate determination that he was ineligible for medical retirement should be upheld." *Id.* The Board "is empowered to make disability determinations in the first instance, even if additional medical processing at the time of discharge would have been appropriate." *Id.* Because the Board denied Plaintiff's claim after a full review of the evidence, any procedural error regarding the separation exam was harmless.

Of course, the Board relied on the separation physical in deciding the ultimate question of fitness, noting it "to be persuasive evidence of [Plaintiff's] medical fitness at the time of [his] discharge." AR 486. The Court, however, must view both the record and the Board's decision as a whole. *In re Gartside*, 203 F.3d at 1312. As has been discussed at length, the Board primarily based its decision on Plaintiff's performance evaluations showing that he could perform duties substantially similar to those of a Marine rifleman in a garrison environment. *See* AR 482-89. The Board explicitly favored this form of evidence over the medical evidence. AR 483 ("The most compelling evidence that you were fully capable of performing the duties of your office, grade, rank, or rating was that you were, in fact, capably performing the duties of your office, grade, rank, or rating as an Instructor at [the Field Medical Training Battalion]"). Even without the separation physical weighing against Plaintiff's claim, a reasonable fact finder could have nevertheless arrived at the Board's decision as Plaintiff's fitness reports constitute substantial evidence sufficient to uphold the Board's opinion. *See In re Gartside*, 203 F.3d at 1312 (explaining that the substantial evidence standard asks "whether a reasonable fact finder could have arrived at the agency's decision" and "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision").

Plaintiff also argues that the Board more generally considered the absence of a referral pre-discharge in deciding the ultimate question of fitness. ECF 47 at 40-41. This assertion appears to be based on the following statement by the Board:

> This medical record would not likely result in the referral of
> any Marine to a MEB. It is unlikely that any physician would,
> and apparently none among the numerous different specialty
> clinics and primary care providers that you visited at different
> locations after incurring your final TBI in June 2010 did,

> believe that your medical conditions significantly interfered with the performance of duties appropriate to your office, grade, rank or rating. This is not surprising since, as discussed further below, you were, in fact, successfully performing duties appropriate to your office, grade, rank, or rating despite your medical conditions.

AR 478. According to Plaintiff, the Board's reasoning amounts to little more than "Mr. Bee was fit because no one found him to be unfit." ECF 47 at 41. Plaintiff cites *Hassay v. United States* for the proposition that "[the Navy] should not be permitted to rely on the absence of contemporaneous evidence" that a service member's condition made him unfit for service "to the extent that the Navy violated its own regulations by not referring him to the Disability Evaluation System." 150 Fed. Cl. 467, 482 (2020).

As a threshold issue, however, the Board did not generally rely on Plaintiff's non-referral in deciding the question of fitness. The previous excerpt simply notes that Plaintiff's non-referral was not "not surprising" and consistent with the evidence that he was successfully performing the duties of his office, grade, rank, and rating. AR 478. Further, even if the Board did rely more generally on the absence of a referral, the Court is not convinced that such a consideration was inappropriate. Even assuming that the separation exam was irregular, Plaintiff underwent numerous other exams before discharge. The Board "applied the presumption of regularity to the assessments made by [Plaintiff's] numerous medical providers between [his] TBI in June 2010 and [his] discharge in April 2013." AR 478. Apart from the separation physical, Plaintiff does not allege that any of these exams failed to comply with standard policy or were otherwise irregular. In sum, one irregular exam should not prevent the Board from considering the fact that none of the medical professionals over a roughly three-year period leading up to Plaintiff's discharge found it necessary to refer him to a MEB.

### 3. C&P Exam by Dr. Vogel

Next, Plaintiff argues that the Board inappropriately discounted his VA disability ratings and the C&P exam on which they were based. ECF 47 at 47. According to Plaintiff, the Board failed to even reference or acknowledge his VA disability ratings of 70% for PTSD and 70% for TBI—both of which considerably exceed the 30% threshold to qualify for disability retirement. *Id.*

Section 1201 of Title 10 provides that military personnel who become disabled in service with at least a 30% disability rating are eligible to receive disability retirement pay from the Department of Defense. 10 U.S.C. § 1201(a), (b)(3)(B). However, this Court has held that VA disability ratings are not binding on the service branches and are "in no way ultimately determinative of claims for military disability retirement." *Hinkle v. United States,* 229 Ct. Cl. 801, 805 (1982). The sole standard remains that of fitness to perform the duties of the office, grade, rank or rating. SECNAVINST 1850.4E, § 3302; *see also Gossage v. United States,* 91 Fed. Cl. 101, 110 (Fed. Cl. 2010) (quoting DoD Directive

1332.18, ¶ 3.3). Of course, VA disability ratings and the exams on which they are based constitute relevant evidence that must be considered in determining unfitness for duty. *Valles-Prieto v. United States*, 159 Fed. Cl. 611, 618 (2022) (citing *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)). And to be sure, two 70% disability ratings based on an exam conducted immediately before discharge, as is the case here, are not to be easily outweighed or discounted by any of the service branches. *See id.*

Here, however, the Court is satisfied that the Board appropriately weighed this evidence. As discussed, Plaintiff's VA ratings were initially based on Dr. Vogel's C&P exam from January 2013. AR 104-115. The Board fully dissected Dr. Vogel's report and found that it was outweighed by contrary evidence. The Board stated of the report:

> [Dr. Vogel's] conclusions … were not supported by the objective evidence regarding your performance. Dr. Vogel reported that your suffered numerous functional impairments resulting from your TBI and/or PTSD conditions, but for every impairment that he noted there was objective evidence that such impairments were not nearly as debilitating as he reported them to be and/or that they did not impede your performance of duties. For example, he reported that you usually get "lost in unfamiliar surroundings, [have] difficulty reading maps, following directions and judging distances," but your [fitness reports] reflect that you successful trained thousands of Navy Medical Department and Religious Program personnel in the knowledge, skills, and abilities necessary to serve with and support the Marine Corps, which specifically included land navigation skills. He reported cognitive function deficits affecting your memory and difficulty learning new material, planning and organizing, and maintaining attention or concentration on a task, but you were lauded during the period in question specifically for your maintaining "flawless accountability of personnel, weapons, and equipment for [your] platoons," for your "leadership, professional knowledge, and *meticulous attention to detail* [which] earned [you] the respect and admiration of students and staff (*emphasis added*)," and for developing "field exercises that more accurately represent current tactics, techniques, and procedures currently being experienced in current operational theaters." He reported that you experienced difficulty in communicating with others, but you somehow effectively trained thousands of Navy Medical Department and Religious Program personnel to successfully serve with and support Marine Corps operational units.

AR 480.

As is clear, the Board found it nearly impossible to square Dr. Vogel's opinion with Plaintiff's documented performance in his fitness reports. The Board rightly determined that something must give, that something being the C&P exam. *See id.* That the Board put greater weight on Plaintiff's fitness exams comports with SECNAVINST 1850.4E, § 3205a, which recognizes that "an assessment of the member's performance of duty by his or her chain of command may provide better evidence of the member's ability to perform his or her duties than a clinical estimate by a physician." Indeed, as the Board acknowledged, Plaintiff's fitness reports were based on direct observation of Plaintiff's performance, whereas his degree of impairment as described in Dr. Vogel's opinion was informed by his own self report. AR 479-80. This is not to question Plaintiff's truthfulness, nor is it necessary to do so.[9] There are a variety of reasons Plaintiff may have overreported his symptomology during the C&P exam. It is also possible, as the Board acknowledged, that Plaintiff's symptomology was accurately reported but simply did not affect his work performance in the way one might have predicted. *Id.* ("[F]or every impairment that [Dr. Vogel] noted there was objective evidence that such impairments were not nearly as debilitating as he reported them to be and/or that they did not impede your performance of duties."). Either way, the Board did not err in finding that the probative value of the C&P exam was outweighed by Plaintiff's fitness reports.[10]

Of course, the Board's treatment of Dr. Vogel's opinion is not without misstep. At one point, the Board described in its view "the inherent unreliability and irrelevance of a VA C&P examination toward fitness determinations in general." AR 485. This statement is erroneous because, as already discussed, VA C&P exams are relevant evidence to be considered in deciding fitness. *Valles-Prieto*, 159 Fed. Cl. at 618. However, such a statement is not reversable error. If the Board believed that C&P exams do not need to be considered or weighed against contrary evidence, it made absolutely no attempt to follow through on that belief. As is clear from the above excerpt, the Board thoroughly considered and weighed Dr. Vogel's exam but simply found it to be less probative than contrary evidence speaking directly to the question of Plaintiff's fitness (*i.e.*, Plaintiff's fitness reports). AR 480.

### 4.  Report of Dr. Blumenfield

Plaintiff further challenges the Board's negative treatment of Dr. Blumenfield's report, which was conducted roughly five years after Plaintiff left service and found him

---

[9] Further, like the Board, this Court does not question the current severity of Plaintiff's conditions or his entitlement to the disability compensation he is currently receiving.

[10] Notably, Plaintiff never argues that his fitness reports painted an inaccurate picture of his performance. Nor could such an allegation be supported by the evidence. By all accounts, Plaintiff performed admirably in his instructor billet and any argument to the contrary would invoke the unsavory charge that Plaintiff's superiors were misreporting his performance over a two-and-a-half-year period to the detriment of his peers and those under his instruction. *See, e.g.,* AR 385-86, 391, 392.

unfit for duty at the time of discharge. In assessing the report, the Board "did not doubt Dr. Blumenfield's credentials or qualifications" but "did not find his report to be particularly persuasive." AR 479. Plaintiff argues that the Board discounted Dr. Blumenfield's opinion for three inappropriate reasons.

First, Plaintiff disputes the Board's finding that Dr. Blumenfield "'provided nothing to support his conclusion.'" ECF 47 at 46. Plaintiff contends that Dr. Blumenfield reviewed thousands of pages of medical records, including the Dr. Johnson and Dr. Vogel reports, personally interviewed Plaintiff and his wife, and performed diagnostic tests on Plaintiff. *Id.* (citing AR 163–66).

The Court disagrees. The Board did not state that Dr. Blumenfield provided no explanation whatsoever. Rather, the Board stated that Dr. Blumenfield "provided nothing to support his conclusion that [Plaintiff's] conditions interfered with [his] ability to perform duties appropriate to [his] office, grade, rank or rating" and that his conclusions in this regard "were not explained or supported by any analysis." AR 479. This is a fair characterization of the report. "[T]he question of fitness is … not merely a medical one," and a medical examiner who opines on the question of fitness is no longer acting solely in his medical capacity. *Ferrell v. United States,* 23 Cl. Ct. 562, 571 (1991). Dr. Blumenfield failed to explain how he jumped from point A, Plaintiff's medical conditions, to point B, Plaintiff's unfitness. The report simply catalogues Plaintiff's medical history and symptomology as though it is self-evident that a person with Plaintiff's conditions cannot serve as a Marine rifleman. AR. 163-166. Dr. Blumenfield never addressed any of the duties of a Marine rifleman, as the Board pointed out, nor did he explain how Plaintiff's conditions might impede performance of those duties. *Id.* Further, even if Dr. Blumenfield provided such explanation, his conclusion is severely undermined by his failure to consider evidence to the contrary. Indeed, the Board found it difficult to credit the report as Dr. Blumenfield did not review any contemporaneous records describing [Plaintiff's] *performance of duties* during the period in question" (*i.e.*, Plaintiff's fitness reports). AR 479 (emphasis added). The Board may certainly discredit a conclusion that is reached without consideration of key conflicting evidence.

Second, Plaintiff takes issue with the Board's reasoning that "it was not even clear … that [Dr. Blumenfield] knew the duties of a Marine rifleman or understood and applied the standard for a finding of medical unfitness in making these conclusions." AR 479. *See also* ECF 47 at 47. According to Plaintiff, this criticism ignores Dr. Blumenfield's explanation that Plaintiff had described his history and role in the Marine Corps. ECF 47 at 47; AR 163–64

That may be. However, Plaintiff's description of his history in the Marine Corps, which presumably included his numerous deployments, only raises additional concerns. It is unclear whether Dr. Blumenfield limited his analysis to Plaintiff's role in a garrison environment or whether he disproportionately considered Plaintiff's numerous deployments and impermissibly rested his conclusion on Plaintiff's deployability and ability to engage in combat. Like the Board, the Court cannot assess Dr. Blumenfield's

analysis because it is not in his report. When a medical professional opines on the ultimate question of fitness, his opinion (like any opinion) is only as persuasive as the force of its reasoning. Because Dr. Blumenfield did not discuss the duties of a Marine rifleman or even reference the correct standard for determining fitness, the Board had sufficient reason to assign his opinion little weight.

Third, Plaintiff argues that the Board acted inappropriately by considering the for-profit nature of Dr. Blumenfield's services. ECF 47 at 46. Specifically, the Board found that Dr. Blumenfield possessed a "financial incentive to reach a particular result." AR 479. According to Plaintiff, the Board had no basis in the record to speculate that Dr. Blumenfield's compensation was in any way tied to the result of his examination. ECF 47 at 46. Plaintiff cites two cases for the proposition that the Board cannot dismiss a medical opinion merely because the physician was paid for his services. *Id.* (citing *Hassay*, 150 Fed. Cl. at 480; *Ferrell*, 23 Cl. Ct. at 571).

These citations do not touch upon the cited proposition, however, and appear to have been made in error. The Court is not aware of any prohibition on the Board considering, among other things, the financial incentive of a private medical examiner. And even if such a consideration is impermissible, Plaintiff has not shown that he was prejudiced by such an error. *See* 5 U.S.C. § 706. Financial incentive aside, the Board had a sufficient basis to discount Dr. Blumenfield's opinion based on his failure to consider key evidence and to articulate the applicable standards.

### 5. Other Factual Findings

Finally, the Board considered two additional factors set forth in SECNAVINST 1850.4E, § 3302b, namely whether Plaintiff's medical conditions: (1) "represent[ed] a decided medical risk to the health of the member or to the welfare of other members were the member to continue on active duty;" and (2) "impose[d] unreasonable requirements on the military to maintain or protect the member." AR 486 n.35. The Board expressly found that neither factor supported Plaintiff's claim, citing substantial evidence to support its conclusion. *See* AR 481-82.

Plaintiff argues that the Board made incorrect factual assertions in considering the first factor. In relevant part, the Board stated that "there simply was no evidence to support a belief that [Plaintiff's] conditions would seriously compromise [his] health or well-being if [he] were to remain in the Marine Corps" because after "being removed from LIMDU status in October 2010, [Plaintiff] had only two medical encounters related to [his] TBI and PTSD conditions over the next two years." AR 481. Plaintiff argues that he had at least seven medical encounters related to his PTSD and TBI during the time period outlined by the Board.[11] AR 47 at 43.

---

[11] Plaintiff also contends that the Board understated his limited duty status by two months. ECF 47 at 35. The record is admittedly unclear on this point (in fact, Plaintiff previously told the Board that his limited

How Plaintiff arrives at these seven encounters, however, is far from clear. Rather than list them with any specificity, Plaintiff merely cites to various sections of the administrative record in cursory fashion. ECF 47 at 35 (citing AR 179-81, 426-27; Am. Compl. at 21-22).[12] Even if the Board overlooked a particular medical encounter, the Board's reasoning was informed more by the outcome than the number of such encounters. AR 481. In finding that Plaintiff's condition did not seriously compromise his health, the Board placed particular weight on the fact Plaintiff was "returned to duty with no medical restrictions" after each encounter and that at no point did Plaintiff's conditions "require close medical supervision or hospitalization." *Id.* Ultimately, the Court is satisfied that the Board considered and articulated a fair and accurate view of Plaintiff's medical record and history.

### C. Totality of the Record Supports the Board's Conclusion

In sum, the Court does not review the record in piecemeal fashion but "as a whole, taking into account evidence that both justifies and detracts from the [Board's] decision.'" *OSI Pharms.*, 939 F.3d at 1381-82 (Fed. Cir. 2019) (citing *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)). Here, when considering the record as a whole, there is substantial evidence to support the Board's conclusion that Plaintiff was fit to perform the duties of his office, grade, rank, and rating. Although there is evidence in favor of Plaintiff's claim, it is not enough for this Court to overturn the Board's weighing of the evidence. *Ford v. United States*, 150 Fed. Cl. 220, 224 (2020) ("If the Court finds that the [B]oard's decision was reasonable and supported by substantial evidence, it will not overturn the [B]oard's decision."). Ultimately, the Court agrees with the Board that the most probative evidence of Plaintiff's fitness is his fitness reports speaking directly on the question. To paraphrase the Board, the most compelling evidence that Plaintiff could perform the duties of his office, grade, rank, or rating, at the time of discharge, is that he was, in fact, capably performing the duties of his office, grade, rank, or rating at the time of discharge. AR 483.

## CONCLUSION

For the foregoing reasons, the Government's Motion for Judgment on the Administrative Record (ECF 54) is **GRANTED**. Plaintiff's Motion for Judgment on the Administrative Record (ECF 47) and the Government's Motion to Dismiss (ECF 54) are **DENIED**. The Clerk of Court is directed to enter judgment accordingly.

---

duty status was terminated in September 2010). At least one notation in Plaintiff's medical records indicates that he was "returned" to his previous active-duty status as of October 26, 2010. AR 179. At any rate the Court finds this exact factual dispute to be purely peripheral to the Board's weighing of the evidence.

[12] As an example of additional medical encounters, Plaintiff cites a portion of the AR showing his pharmaceutical history during that time. ECF 47 at 35 (citing AR 426–27). The Court does not interpret "medical encounters" as used by the Board to include pharmacy transactions.

**IT IS SO ORDERED.**

_____
PHILIP S. HADJI
Judge